**Randy L. JOHNSON, Sr., Plaintiff,**

v.

**STATE TECHNOLOGY CENTER AT MEMPHIS also known as Tennessee Technology Center at Memphis, Board of Regents, and the State of Tennessee, Defendants.**

No. 97–2716–V.

United States District Court,
W.D. Tennessee,
Western Division.

Oct. 6, 1998.

Center at Memphis, Board of Regents, and the State of Tennessee, (collectively "the State"), have discriminated against him in violation of Title II of the Americans With Disabilities Act (ADA)[1], Section 504 of the Rehabilitation Act of 1973[2], and 42 U.S.C. § 1983. Before the court[3] is the Motion for Summary Judgment filed by the State. The State asserts that it is entitled to summary judgment for two reasons. First, it claims that this court lacks subject matter jurisdiction because Congress did not validly abrogate the State's Eleventh Amendment immunity when it enacted the ADA and the Rehabilitation Act. Second, it claims that Johnson is not a qualified individual with a disability under either the ADA or the Rehabilitation Act because he had not obtained the required federal medical certification or a waiver of the certification requirement which is necessary to operate a commercial motor vehicle.[4] For the reasons set forth below, these motions are hereby DENIED.

## BACKGROUND AND UNDISPUTED FACTS

On October 21, 1996, Johnson, a paraplegic, enrolled in a commercial truck driving course at Tennessee Technology Center at Memphis. Tennessee Technology Center at Memphis, also known as State Tech, is one in a statewide system of area vocational schools which are a part of the State University and Community College System governed by the Tennessee Board of Regents. All students participating in the commercial truck driving course are required to have a physical examination. Johnson was permitted to take the classroom portion of the course, but was prevented from participating in the driving portion of the class. At some point in time,

James V. Ball, Memphis, TN, for Plaintiff.

S. Elizabeth Martin, Office of the Attorney General, Nashville, TN, for Defendant.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

VESCOVO, United States Magistrate Judge.

Randy L. Johnson, Sr., a paraplegic, claims that the defendants, State Technology

1. 42 U.S.C. §§ 12131–12165 (1995).

2. 29 U.S.C. § 794 (Supp.1998).

3. The parties have consented to the trial of this matter before the undersigned United States Magistrate Judge.

4. The State also moves for summary judgment as to Johnson's Section 1983 claim on the basis that the State has not waived its Eleventh Amendment immunity. In response to the State's motion, Johnson agreed that his claim under Sec-

tion 1983 was not available against the State. States, state agencies, and state officials acting in their official capacities are not persons within the meaning of 42 U.S.C. § 1983. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Accordingly, the State's motion for summary judgment as to Johnson's Section 1983 claim is granted.

Johnson was informed by Tennessee Technology Center officials and the Tennessee Board of Regents General Counsel's office that in order to be allowed to participate in the driving segment of the course he would be required to comply with Federal Highway Administration regulations governing the driving of commercial vehicles in interstate commerce. Included in those regulations is the following provision:

> A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and ... has on his/her person the original, or a photographic copy, of a medical examiner's certificate that he/she is physically qualified to drive a commercial motor vehicle.

49 C.F.R. § 391.41(a) (1998). The federal regulations also provide an alternate means of becoming qualified to drive a commercial motor vehicle for those individuals who are not physically qualified to do so:

> A person who is not physically qualified to drive under § 391.41(b)(1) or (2) and who is otherwise qualified to drive a commercial motor vehicle, may drive a commercial motor vehicle, if the Regional Director of Motor Carriers has granted a waiver to that person.

49 C.F.R. § 391.49(a).

Johnson's medical certificate states that he is not medically qualified to drive a commercial motor vehicle unless his certificate is accompanied by a waiver. During the period he was enrolled in the course, Johnson did not apply for the requisite waiver from the Federal Highway Administration. Tennessee Technology Center at Memphis did not allow Johnson to drive a truck as part of the class and did not provide a retrofitted truck in order to accommodate his disability. Nevertheless, Tennessee Technology Center at Memphis does assert in its course catalog and student handbook that it complies with the Americans with Disabilities Act.

## CONTENTIONS OF THE PARTIES

Primarily, the State argues that it is entitled to summary judgment regardless of whether Johnson is a qualified individual because Congress's enactment of the ADA and the Rehabilitation Act did not constitute an effective abrogation of the Eleventh Amendment. In addition, the State contends that its failure to provide a retrofitted truck was not a violation of the ADA or the Rehabilitation Act because Johnson's failure to comply with Federal Highway Administration regulations by obtaining a medical certificate or waiver prevented him from becoming a qualified individual, and therefore the State did not have to make any reasonable accommodation for Johnson. Further, the State contends that Johnson could have obtained a limited training waiver from the Tennessee Department of Transportation without having to take and pass a road test.

Johnson admits that he did not seek a waiver during his enrollment in the truck driving course or prior to being denied the opportunity to participate in the driving portion of the course. However, he asserts that he has since applied for the requisite waiver by mailing an application for a waiver on September 16, 1998. Further, Johnson contends that he only became aware of the waiver application process when the Department of Transportation doctor had a waiver packet mailed to Johnson subsequent to the performance of a medical evaluation. Regardless of when he applied for the waiver, Johnson asserts that he would have been required to pass a road test in order to receive a waiver. Consequently, Johnson believes that even if he had applied for the waiver prior to, or during, his enrollment in the course he would not have been granted a waiver because he did not have the skills training necessary to pass the road test without first completing the driving portion of the course. Johnson summed up his predicament as follows:

> Plaintiff submits that in order to get a waiver in compliance with the Federal Highway Administration, he would need a road test, but that before he could take the road test, he would need the skills training which Tennessee Technology Center provided. Yet, as previously stated, Tennessee Technology Center required a Federal waiver before Plaintiff could drive a truck with an instructor.

(Pl.'s Resp. to Mot. for Summ. Judg. of Defs. at 5.) Johnson therefore points to the lack of

a retrofitted truck on which he, or any other qualified individual with a disability, could use to complete the offered truck driving course as the obstacle preventing him from being granted a waiver.

Johnson further contends that because the United States Supreme Court has not yet addressed whether Congress had the power to abrogate the Eleventh Amendment when enacting the ADA and the Rehabilitation Act a grant of summary judgment on that question would be inappropriate.

## DISCUSSION

■ Generally, federal courts should avoid addressing constitutional questions if a decision can be reached on nonconstitutional grounds. *See Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). An assertion of Eleventh Amendment immunity, however, challenges the court's jurisdiction. *See Seaborn v. State of Florida, Department of Corrections*, 143 F.3d 1405, 1406 (11th Cir.1998). A challenge to jurisdiction must be resolved before a court can determine the merits of the underlying claim. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). Accordingly, this court must first confront the constitutional issue raised by this summary judgment motion: whether Congress effectively abrogated the Eleventh Amendment when it enacted the ADA and the Rehabilitation Act.[5]

### A. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.*, 979 F.2d

1131, 1133 (6th Cir.1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact at issue in the case. *LaPointe*, 8 F.3d at 378. This may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir.1993).

In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, "this court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson*, 477 U.S. at 251–53, 106 S.Ct. 2505). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.

---

5. Johnson has urged that summary judgment is inappropriate in this case because the United States Supreme Court has not yet ruled on the question herein presented. Johnson, however, cites no case law to support such a position and the court is unaware of any case so holding. The question of whether the Eleventh Amendment was abrogated by the enactment of the ADA and the Rehabilitation Act is a question of law and a proper subject for determination at the summary judgment level.

See *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994).

### B. *Did Congress abrogate the Eleventh Amendment?*

The Eleventh Amendment states: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const.Amend. XI. Despite the actual language of this amendment, the Supreme Court has construed it to also grant states immunity from suits filed by its own citizens in federal court if the state has not consented to such suits. See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Notwithstanding the Eleventh Amendment, Congress has the power to abrogate this immunity when acting pursuant to its power under Section 5 of the Fourteenth Amendment.[6] See *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114; *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

In determining whether Congress validly exercised its Section 5 enforcement power to abrogate state immunity, the court must answer two questions: (1) whether Congress " 'unequivocally expressed its intent to abrogate the immunity' "; and (2) if Congress did clearly express its intent to abrogate, did Congress act " 'pursuant to a valid exercise of power.' " *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114 (quoting *Green*

*v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). The only valid way Congress can abrogate state immunity is by exercising its Fourteenth Amendment enforcement power.[7]

The ADA specifically addresses the issue of state immunity:

[a] State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a state for a violation of the requirements of this chapter, remedies (including remedies at both law and equity) are available for such a violation to the same extent as such remedies are available ... against any public or private entity other than a state. 42 U.S.C. § 12202 (1995).

Every court that has addressed the question of state immunity and the ADA after *Seminole Tribe* has agreed that Congress's patent expression of intent to abrogate state immunity in this provision of the ADA satisfies the first *Seminole Tribe* prong. Similarly, Congress has clearly expressed its intent to abrogate state immunity under the Rehabilitation Act: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d–7(a)(1) (1995). Thus, the sole remaining question before this court is whether Congress's attempted abrogation of Eleventh Amendment immunity under the ADA and the Rehabilitation Act was a proper exercise of its power to enforce the provisions of the Fourteenth Amendment. The United States

**6.** A state may also waive its Eleventh Amendment immunity. At least one circuit has found that states have waived whatever immunity they have, if any, under the Rehabilitation Act. "One way for a state to waive its immunity is to accept federal funds where the funding statute 'manifest[s] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity.' " *Clark v. State of California*, 123 F.3d 1267, 1271 (9th Cir.1997) (quoting *Atascadero*, 473 U.S. at 247, 105 S.Ct. 3142).

Johnson, however, has not argued that such a waiver has occurred in the present case, thus the court need not address that issue.

**7.** Prior to *Seminole Tribe*, the Court had held that Congress also had the power to abrogate the Eleventh Amendment when exercising its power under the Commerce Clause. See *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 14–15, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality opinion). *Seminole Tribe*, however, expressly overruled *Union Gas* thereby leaving Section 5 enforcement power as the only available vehicle for abrogating the Eleventh Amendment.

Supreme Court has not yet addressed this question; neither has the Sixth Circuit. The Sixth Circuit has, however, provided some insight into how it may view this issue in a recent opinion upholding Congress' power to abrogate state immunity under the Age Discrimination in Employment Act. *See Coger v. Board of Regents,* 154 F.3d 296 (6th Cir. 1998). Furthermore, the clear majority of courts that have addressed this issue have determined that Congress properly exercised its Section 5 power in abrogating state immunity under the ADA and the Rehabilitation Act.

Section 5 of the Fourteenth Amendment declares that "Congress shall have the power to enforce, by appropriate legislation, the provisions of [that] article." U.S. Const. Amend. XIV. "Therefore, Congress can enact legislation pursuant to Section 5 that is designed to enforce the prohibitions expressly directed at the States in Section 1 of the Fourteenth Amendment, and Congress may validly abrogate the States' immunity from suit in those circumstances."[8] *Lamb v. John Umstead Hosp.,* 19 F.Supp.2d 498 (E.D.N.C. 1998). (citing *Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. 1114). Consequently, Congress may abrogate state immunity if it is exercising its power to enforce substantive provisions of the Fourteenth Amendment such as the Equal Protection Clause. The Supreme Court has explained that the Equal Protection Clause means that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In particular, the Court has recognized that the disabled are protected against discrimination by the Equal Protection Clause. *See id.* at 446, 105 S.Ct. 3249.

Historically, the Supreme Court has interpreted Congress's enforcement powers under the Fourteenth Amendment quite broadly. In 1879, the Court announced an expansive understanding of congressional enforcement power.

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex parte Virginia,* 100 U.S. 339, 345, 25 L.Ed. 676 (1879). Later, the Court boiled the process down to the application of a three-part test. Under that test, Section 5 legislation is validly enacted to enforce the Equal Protection Clause when the statute: "[1] may be regarded as an enactment to enforce the Equal Protection Clause, [2] ... is 'plainly adapted to that end' and [3] ... is not prohibited by but is consistent with 'the letter and spirit of the constitution.' " *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819)).

More recently, the Court clarified that Congress's enforcement powers under the Fourteenth Amendment, although broad, do have an outer limit. *See City of Boerne v. P.F. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *Flores,* the Supreme Court declared the Religious Freedom and Restoration Act (RFRA) unconstitutional. Congress enacted RFRA in response to the Supreme Court's previous decision in *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Supreme Court had held neutral, generally applicable laws may significantly burden religious practices even when the laws are not supported by a compelling state interest. RFRA basically amounted to an attempt to eviscerate the holding in *Smith* by legislatively requiring states to prove that laws substantially

---

**8.** Section 1 of the Fourteenth Amendment states in pertinent part:

Section 1.... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const.Amend. XIV.

burdening religious practices further a compelling state interest and do so by the least restrictive means necessary.

Summarizing the highlights of the *Flores* decision, the Sixth Circuit recently stated:

> In [*Flores* ], the Court held that RFRA was an unconstitutional exercise of Congress's Section 5 power because it was "so out of proportion to the problems identified by RFRA that the statute could not be regarded as enforcing the provisions of the Fourteenth Amendment". The Court arrived at its conclusion after making three determinations. The Court determined first that there was not a "pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in *Smith.*" Second, it found that RFRA imposed "the most demanding test known to constitutional law." In the Court's view, this standard created a likelihood of invalidating many state laws. Third, the Court found that RFRA "contradicts vital principles necessary to maintain separation of powers and the federal balance" because it was such a sweeping response by Congress that it could be interpreted as an attempt to expand the substantive meaning of the Fourteenth Amendment rather than being remedial in nature.

*Coger,* 154 F.3d 296, 1998 WL 476164, at *9 (internal citations omitted).

After *Flores,* it is clear that "[T]he Supreme Court retains the power to decree the substance of the Fourteenth Amendment's restrictions on the states, and Congress may not enlarge those rights." *Clark v. State of California,* 123 F.3d 1267, 1270 (9th Cir. 1997). *Flores* clarified the widely accepted principal that Congress has only remedial power—the power to enforce the substantive provisions of the Fourteenth Amendment by measures that remedy or prevent unconstitutional actions, not the power to decree substantive Fourteenth Amendment restrictions on the states by measures that make a sub-stantive change in Fourteenth Amendment rights. *See Flores,* 521 U.S. at ——, 117 S.Ct. at 2164 (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 326, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). Specifically, the *Flores* Court emphasized that in order for legislation to be within Congress's Fourteenth Amendment enforcement power "[t]here must be *a congruence and proportionality* between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Flores,* 521 U.S. at ——, 117 S.Ct. at 2164 (emphasis added).

The State in this case argues that, under *Flores,* Congress exceeded its remedial powers under Section 5 when it enacted the ADA and the Rehabilitation Act. In essence, the State argues that the affirmative requirement of accommodation placed upon the State by the ADA and the Rehabilitation Act is disproportional to the injury to be prevented and amounts to unconstitutional substantive legislation. To state it another way, the State maintains that the ADA provides an entitlement to accommodation which is not provided to other non-disabled citizens and therefore the remedy is disproportionate to the injury sought to be redressed.

■ In order to properly determine whether the ADA and the Rehabilitation Act meet the "congruence and proportionality" test of *Flores,* one must first examine the evil which these acts sought to address. The purpose of enacting the ADA was not to subsidize the disabled but to eliminate a detestable form of discrimination. *See* 42 U.S.C. § 12101(a)(2) and (a)(3) (1995); H .R.Rep. No. 101–485(II) at 22, 30, 42 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 311–12, 324. Unlike the RFRA, Congress made extensive findings of fact concerning the evil sought to be addressed prior to enacting the ADA.[9] Those Congressional

---

9. Those findings included:
(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations,

findings are entitled to great deference. "It is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *Flores*, 521 U.S. at ——, 117 S.Ct. at 2172 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)). Further, deference to Congressional findings is particularly appropriate in the context of disabled individuals in light of the Supreme Court's comments in *Cleburne*. In *Cleburne*, the Court stated: "How this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary". *Cleburne*, 473 U.S. at 442–43, 105 S.Ct. 3249.

■■■■ The pivotal question then is whether the remedies provided under the ADA and the Rehabilitation Act are so sweeping as to fail the proportionality prong of the *Flores* test. "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the states.' " *Flores*, 521 U.S. at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). Accordingly, although the accommodation

provisions address some conduct not itself unconstitutional that fact alone does not mean that the remedy is disproportionate to the injury sought to be redressed.

Under the terms of the Act only reasonable accommodations must be made. *See* 42 U.S.C. § 12112(5)(A) and (B) (1995). A public entity may avoid having to make a reasonable accommodation if doing so would impose an undue burden or hardship. *See* 42 U.S.C. § 12111(10) (1995); 29 C.F.R. § 1630.2(p) (1998). This court agrees that "[t]hese limiting provisions illustrate the proportionality of the ADA. By its own terms, the scope of the remedies offered by the ADA are appropriately tailored to the injury, i.e., discrimination against the disabled, that Congress sought to address in enacting that statute." *Lamb*, 19 F.Supp.2d 498 at 507.

■■■■ To support its arguments, the State directs the court's attention to two district court decisions declaring that the ADA and the Rehabilitation Act were not properly enacted under Congress's Fourteenth Amendment enforcement power, *Brown v. North Carolina Div. of Motor Vehicles*, 987 F.Supp. 451 (E.D.N.C.1997), and *Nihiser v. Ohio Environmental Protection Agency*, 979 F.Supp. 1168 (S.D.Ohio 1997).[10] The State also relies on dissenting opinions in two recent circuit decisions, *Kimel v. Board of Regents*, 139 F.3d 1426, 1444–49 (11th Cir.1998) (Cox, J.,

---

education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;
(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.
42 U.S.C. § 12101(a) (1995).

**10.** The court has also discovered another district court decision supporting the State's position. *See Garrett v. Board of Trustees*, 989 F.Supp. 1409, 1410 (N.D.Ala.1998) ("Congress cannot stretch Section 5 and the Equal Protection Clause of the Fourteenth Amendment to force a state to provide allegedly equal treatment by guaranteeing special treatment or accommodation for disabled persons. . . .")

dissenting in part) and *Coolbaugh v. State of Louisiana*, 136 F.3d 430, 439–42 (5th Cir. 1998) (Smith, J., dissenting).

The central theme of each of those decisions is that Congress overstepped its bounds in enacting the ADA and the Rehabilitation Act in three main ways. First, Congress failed to recognize that only irrational discrimination against the disabled is unconstitutional because the disabled after *Cleburne* are not a suspect class. Instead, Congress attempted to circumvent the level of judicial scrutiny for state actions affecting the disabled. Second, the accommodation provisions provide to the disabled a substantive right not previously recognized under the Equal Protection Clause—the right to preferential treatment and thus amount to substantive and not merely remedial legislation. Third, because the

> accommodation provisions are not limited to the prevention of discrimination, but rather apply where the sole impediment to the disabled individual's ability to perform the job is the individual's disability, and where the employer is innocent of any discriminatory animus ... they permit a remedy even where there is no injury ... [and] are disproportionate.

*Nihiser*, 979 F.Supp. at 1174.

The great weight of authority, however, has rejected these arguments. The Fifth, Seventh, Ninth, and Eleventh Circuits have concluded that the ADA and the Rehabilitation Act were properly enacted pursuant to Congress's power to enforce the Fourteenth Amendment.[11] *See Seaborn v. State of* Florida, 143 F.3d 1405 (11th Cir.1998); *Kimel v. State of Florida Board of Regents*, 139 F.3d 1426 (11th Cir.1998); *Coolbaugh v. State of Louisiana*, 136 F.3d 430 (5th Cir.1998); *Clark v. State of California*, 123 F.3d 1267 (9th Cir.1997); *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481 (7th Cir.1997).

Additionally, three district court decisions have reached similar conclusions. *See Lamb v. John Umstead Hosp.*, 19 F.Supp.2d 498 (E.D.N.C.1998)[12]; *Anderson v. Department of Public Welfare*, 1 F.Supp.2d 456 (E.D.Pa. 1998); *Martin v. State of Kansas*, 978 F.Supp. 992 (D.Kan.1997). This court finds the above-mentioned majority-view opinions to be well-reasoned and persuasive.

In addition to the points mentioned above, the state also makes two broader arguments. First, the State argues that the power of Congress to enforce the Equal Protection Clause must be limited to those groups which the Supreme Court has seen fit to provide special protection under the Constitution, i.e. suspect classes. Because state laws affecting disabled individuals are only subject to rational basis review by the judiciary and not heightened scrutiny, the State maintains that Congress should not be granted the power to enact legislation preventing discrimination.

A major flaw in the State's reasoning has been articulated by the Ninth Circuit.

> We reject California's argument that Congress's power must be limited to the protection of those classes found by the Court to deserve "special protection" under the Constitution. The State does not explain why the Court's choice of a level of scrutiny for purposes of judicial review should be the boundary of the legislative power under the Fourteenth Amendment, nor have we found any case to so hold. The levels of scrutiny in equal protection cases are "standards for determining the validity of state legislation or other official action that is challenged as denying equal protection." The State cites no case which holds that these levels of scrutiny define the limits of Congress's power to enforce the Fourteenth Amendment. *Clark v. State of California*, 123 F.3d 1267, 1270–71 (9th

---

**11.** Initially, the Eight Circuit reached a similar conclusion in *Autio v. AFSCME, Local 3139*, 140 F.3d 802 (8th Cir.1998), however, that circuit subsequently granted a rehearing en banc and vacated the opinion in that case.

**12.** It should be noted that the *Lamb* decision arises out of the same district court, albeit a different district judge, as the *Brown* decision

upon which the State presently relies in support of its motion. After an intervening Fourth Circuit opinion in a case involving abrogation and the Fair Labor Standards Act, the United States District Court for the Eastern District of North Carolina issued *Lamb* which flatly contradicts *Brown* regarding the question of abrogation and the ADA.

Cir.1997) (quoting *Cleburne*, 473 U.S. at 439–40, 105 S.Ct. 3249).

In addition, the Sixth Circuit recently rejected a similar argument in the context of abrogation under the Age Discrimination in Employment Act (ADEA) stating that "the fact that age is not a suspect classification does not eliminate the Equal Protection Clause as a source authorizing Congress to prohibit age-based discrimination." *Coger*, 154 F.3d 296, at 506.[13]

The State makes another broad argument that the ADA and the Rehabilitation Act must be considered to have gone beyond Congress's remedial power under Section 5 because the effect of these Acts is to provide an entitlement to disabled persons that is not available to the non-disabled, thereby bestowing a privilege upon the disabled. "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). "The ADA recognizes that treating the disabled differently is often necessary to remedy discrimination against them." *Martin*, 978 F.Supp. at 997. As previously indicated, based on the extensive findings of discrimination made by Congress and the reasonableness limitation on accommodations, the court concludes that the remedies set forth in the Act are not disproportionate to the constitutional violations they are designed to remedy.

Finally, in a recent opinion the Sixth Circuit upheld Congress's abrogation of state immunity under the Age Discrimination in Employment Act (ADEA). In *Coger v. Board of Regents*, the Sixth Circuit held that in enacting the ADEA Congress satisfied the two-part *Flores* test. *See Coger*, 154 F.3d 296 (6th Cir.1998). In *Coger*, the Sixth Circuit determined that "(1) Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity in ADEA suits; and in so doing, (2) Congress acted pursuant to a valid exercise of its Section 5 authority to enforce the Equal Protection Clause of the Fourteenth Amendment." *Id.* 154 F.3d at 300. In concluding that Congress had validly exercised its Section 5 powers when it enacted the ADEA, the court noted Congress's extensive factual findings detailing substantial instances of arbitrary discrimination because of age. The court commented that "the evidence before Congress established that qualified workers were being fired, not hired, and paid less because of their age," as well as that "employers used age as an arbitrary proxy for ability." *Id.* at 306. Focusing on the wide latitude afforded Congress by the Supreme Court, the court also determined that the scope of the ADEA was not so sweeping as to be disproportionate. The Sixth Circuit stressed that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in governing law is not easy to discern, and Congress must have wide latitude in determining where it lies." *Id.* at 307 (quoting *Flores*, 521 U.S. at ——, 117 S.Ct. at 2164.)

---

13. This flaw is also cogently discussed in a recent commentary.

> To understand the scope of Congress's Fourteenth Amendment power, it is essential to recognize that the Supreme Court's practice of defining distinct suspect classification and applying heightened review is a judicial, not a legislative, framework. Suspect classifications are triggers that indicate the level of judicial scrutiny to apply. In the absence of a compelling reason to scrutinize a legislative classification, courts defer to legislative judgments. This deference does not derive from the Fourteenth Amendment, but from the Supreme Court's respect for the legislature and its desire to preserve the distinction between legislative and judicial power.

> Unlike a court's power, congressional power is legislative in nature. While the deferential nature of the rational basis test may be necessary to prevent courts from overreaching their judicial function, such a limitation has no application to congressional enactments under the Fourteenth Amendment. Instead, Congress's role as a legislative body permits it to scrutinize every problem it addresses as carefully as it chooses. In the context of enforcing the Fourteenth Amendment, Congress is free to assess the constitutionality of state action that would be shielded from heightened judicial scrutiny by the application of the rational basis test. In this respect, the Fourteenth Amendment gives Congress the ability to prohibit constitutional violations directly, even where the rational basis test would hinder a court's ability to discover a violation.

Elizabeth Welter, Note, *The ADA's Abrogation of Eleventh Amendment State Immunity As A Valid Exercise of Congress's Power to Enforce the Fourteenth Amendment*, 82 Minn.L.Rev. 1139, 1161 (April 1998) (footnotes omitted).

Although *Coger* was limited to the ADEA and did not address the provisions presently before this court, it seems clear that the analytical machinery applied by the Sixth Circuit to the ADEA question when applied to the ADA and Rehabilitation Act will· produce a similar result—validation of Congressional power to abrogate the Eleventh Amendment.

In sum, this court agrees with the majority of the courts that have faced this issue and concludes that the ADA and the Rehabilitation Act did validly abrogate the State's Eleventh Amendment immunity. Furthermore, having reviewed *Coger v. Board of Regents*, the Sixth Circuit's most recent decision regarding Eleventh Amendment abrogation, this court finds it quite likely that the Sixth Circuit will adopt a similar position.

### C. *Is Johnson a qualified individual?*

■ Having disposed of the State's constitutional basis for its motion for summary judgment, the court must now determine whether there exists any genuine issue of material fact regarding Johnson's status as a qualified individual.

Johnson has brought this action under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. "The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance...." *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481, 483 (7th Cir.1997). Accordingly, the court's analysis of Johnson's status as a qualified individual under the ADA applies equally to the Rehabilitation Act.

The ADA not only prohibits discrimination against qualified individuals with disabilities in private employment decisions but also prohibits discrimination in certain settings by public entities. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[14] 42 U.S.C. § 12132

(1995). Tennessee Technology Center and the other state defendants in this case clearly fall within the scope of the definition of a public entity under the act. *See* 42 U.S.C. § 12131(1)(B) (1995) (defining public entity to include "any department, agency, special purpose district, or other instrumentality of a State").

The dispositive question for purposes of the State's motion is whether a genuine issue of material fact exists as to whether Johnson meets the definitional requirement of a qualified individual with a disability. A qualified individual is defined as

"an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

42 U.S.C. § 12131(2) (1995).

■ When litigating a claim under the ADA, the plaintiff has the initial burden of proving that he is a qualified individual with a disability. *See Monette v. Electronic Data Sys.*, 90 F.3d 1173, 1184 (6th Cir.1996). An integral part of such proof would be that he met the essential eligibility requirements for participation in the particular program or activity—State Tech's truck driving class. If Johnson could not present sufficient evidence to show that he was otherwise qualified, then there is no disputed material fact and the State is entitled to summary judgment.

The State relies upon the existence of specific Federal Highway Administration regulations. *See* 29 C.F.R. § 1630.15(e) (1998) (providing a defense to a discrimination charge if "a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would other wise be required"). The State maintains that according to those regulations Johnson could not have been a qualified individual for

14. For the parallel language of the Rehabilitation Act, see 29 U.S.C. § 794(a) (Supp.1998).

whom reasonable accommodation is required because he had neither the requisite medical certification nor a waiver of the physical disqualification determination. Johnson contests this characterization and claims that he could not meet the federal requirements without receiving skills training from the State. Johnson stresses the fact that one of the requirements of an application for a medical waiver is submission of the results of an administered road test. *See* 49 C.F.R. § 391.49(c)(5) (1998).[15] From Johnson's perspective, applying for a waiver prior to acquiring skills training in the State's course would be a fruitless endeavor because he could not take and pass the required road test to gain the waiver.

The State's counter to that argument is somewhat unclear. It appears that the State argues first that a road test is not a necessary requirement to receive a waiver. Alternatively, the State contends that Johnson's argument is meritless because he could have been granted a limited training waiver from the Tennessee Department of Transportation without having to take a road test.

Based on a review of the applicable regulation, it appears that a road test is required for the regular medical waiver. The State's contention as to the ability to be granted a limited training waiver without completing the road test may in fact be true, but the court is unable to make a determination because the State has presented no proof on this issue. Even if true, that fact alone, however, would not mandate a grant of summary judgment for the State. Among the supporting materials Johnson submitted in opposition to this motion was a copy of the

application instructions for the limited training waiver from the Tennessee Department of Safety. The application for the training waiver provides a list of materials that must be submitted with the application, including "Photographs of the vehicle modification made for the applicant, if any." (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ.Judg., Exh. 2.) Listing such a requirement in the application materials for the limited training waiver may mean that a limited waiver will not be granted absent a retrofitted truck.

It is possible therefore that without some indication as to the existence of necessary modifications to a commercial motor vehicle the Tennessee Department of Safety may deny Johnson a limited training waiver. On the current record, a jury might well determine that Johnson makes out a prima facie case of discrimination on the basis of disability because the defendants' failure to acquire and make available a retrofitted vehicle prevents him from acquiring the necessary training waiver.[16]

Viewing the pleadings and supporting materials submitted in this case in a light most favorable to Johnson, as it must, the court finds a genuine dispute as to the material fact of Johnson's status as a qualified individual and thus the State's motion for summary judgment on this basis is denied.

### CONCLUSION

For the foregoing reasons, the court determines that Congress's enactment of the ADA and the Rehabilitation Act effectively abrogated the state's Eleventh Amendment immunity from suit in federal court. Further-

15. 49 C.F.R. 391.49 Waiver of certain physical defects.
   (c) A letter of application for a waiver shall contain—
   . . .
   (5) Road test:
   (ii) A unilateral applicant shall be responsible for having a road test administered by a motor carrier or a person who is competent to administer the test and evaluate its results.

16. Plaintiff has stated that he has submitted an application for this limited training waiver, however, the court is not aware of whether that waiver has been granted. If the waiver has been

granted that, in and of itself, will not suffice to show that Johnson was a qualified individual at the time of his enrollment in the course. The obtaining of a waiver at this late date would not relate back to the time of his enrollment to show that he was at that time a "qualified individual." *See Long v. Chicago Transit Auth.*, 985 F.Supp. 836, 840 (N.D.Ill.1997). Of course, if Johnson has received or receives his training waiver, then it will be clear that the unavailability of a retrofitted truck did not prevent Johnson from obtaining a training waiver, and therefore there would be no ADA violation unless and until the State failed to make a retrofitted truck available after being presented with Johnson's training waiver.

more, the court finds that Johnson has shown the existence of a genuine issue of fact with respect to his status as a qualified individual under the ADA and the Rehabilitation Act. Therefore, defendant's motion for summary judgment as to the claims under the ADA and the Rehabilitation Act are denied.

IT IS SO ORDERED.