USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

 ____________________

No. 98-1400
 
 GAETANO PARELLA, ET AL.,
 
 Plaintiffs, Appellees,
 
 v.
 
 RETIREMENT BOARD OF THE RHODE ISLAND EMPLOYEES' RETIREMENT
 SYSTEM, NANCY J. MAYER, in her official capacities as General
 Treasurer of the State of Rhode Island and as Chairperson,
Treasurer, and Custodian of Funds of the Retirement Board of the
Rhode Island Employees' Retirement System, and JOANN E. FLAMINIO,
in her official capacity as Executive Director of the Retirement
 Board of the Rhode Island Employees' Retirement System,
 
 Defendants, Appellants.
 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND
 
 [Hon. Steven J. McAuliffe, U.S. District Judge]
 ____________________
 Before
 Boudin, Lynch, and Lipez,
 Circuit Judges.
 ____________________
 
 Michael P. DeFanti, with whom Laura A. Pisaturo and Hinckley,
Allen & Snyder were on brief, for appellants Retirement Board of
the Rhode Island Employees' Retirement System and Joann E.
Flaminio, in her official capacity as Executive Director of the
Retirement Board of the Rhode Island Employees' Retirement System.
 Rebecca T. Partington, Assistant Attorney General, for
appellant Nancy J. Mayer, in her official capacity as General
Treasurer of the State of Rhode Island.
 Anthony F. Muri, with whom Barbara S. Cohen and Goldenberg &
Muri were on brief, for appellees Gaetano Parella et al.
 
 ____________________
 
 April 16, 1999
 ____________________
 LYNCH, Circuit Judge. Beginning in 1987, retired Rhode
Island legislators or their beneficiaries became eligible to
receive annual pension benefits that were as much as sixty times
greater than the legislators' annual pre-retirement salaries. When
the Rhode Island General Assembly became aware that the generosity
of these benefits jeopardized the tax-exempt status of the state's
retirement system, it acted to bring the benefits into compliance
with federal tax law by capping annual benefits at $10,000,
effective July 1995. The pensioners whose benefits were thereby
reduced brought suit under 42 U.S.C. 1983 to foreclose any
withholding of benefits, alleging that the benefit cap violated the
Takings Clause, Contract Clause, and Due Process Clause of the
United States Constitution.
 While the suit was pending, Congress retroactively
eliminated the federal tax code's limitations on government
pensions, and the Rhode Island Retirement Board responded by
refunding the withheld benefits. The pensioners then continued
their suit in order to seek interest on the benefits for the time
that they were withheld, as well as attorneys' fees under 42 U.S.C.
 1988. After cross-motions for summary judgment, the district
court granted summary judgment to the pensioners on Takings Clause
grounds, and this appeal followed.
 Because of the peculiar fact pattern of this case, it
raises a number of difficult constitutional issues, including 
several questions related to defendants' asserted Eleventh
Amendment defense. We conclude that Rhode Island's temporary
withholding of excess benefits did not violate the pensioners'
constitutional rights; accordingly, we do not reach the other
issues. We reverse the district court's grant of summary judgment
on the pensioners' 1983 claim, vacate its award of costs and
attorneys' fees under 1988, and remand for entry of summary
judgment in favor of defendants. 
I 
 Summary judgment is appropriate when there is no genuine
issue as to any material fact and the moving party is entitled to
a judgment as a matter of law. See Fed. R. Civ. P. 56(c). The
district court based its order on the following undisputed facts.
 In 1936, the Rhode Island General Assembly enacted
legislation establishing a retirement system for public employees. 
See 1936 R.I. Pub. Laws ch. 2334 (codified as amended at R.I. Gen.
Laws 36-8-1 et seq.); see also National Educ. Ass'n -- Rhode
Island v. Retirement Bd. of the R.I. Retirement Sys., 1999 WL
152589, at *1 (1st Cir. 1999) ("NEA")(describing system's history);
Kass v. Retirement Bd. of the Employees' Retirement Sys., 567 A.2d
358, 358-59 (R.I. 1989) (same); McGrath v. Rhode Island Retirement
Bd., 88 F.3d 12, 13-14 (1st Cir. 1996) (describing related
municipal pension plan). The Rhode Island retirement system is a
defined benefit plan, which requires members to contribute a set
percentage of their yearly salary, see R.I. Gen. Laws 36-10-1, in
exchange for a fixed retirement allowance based on years of service
and salary level achieved, see id. 36-10-10. The retirement
system is administered by a retirement board ("the Board"), which
is chaired by the state treasurer. See id. 36-8-3, 36-8-9. 
 The original provisions of the retirement statute
expressly excluded members of the General Assembly from
participating in the retirement system. See 1936 R.I. Pub. Laws
ch. 2334, 14. In 1947, the Assembly amended the statute to
permit legislators to join the system voluntarily. See 1947 R.I.
Pub. Laws ch. 1971, 5 (codified as amended at R.I. Gen. Laws
 36-9-6). At first, legislator contributions and benefits were
based on the same rates set for ordinary employee members. See id.ch. 1971, 3. Since at that time legislators' compensation was
limited by the Rhode Island Constitution to $300 per year, see R.I.
Const. art. VI, 3 (amended 1994), legislative pensions were
extremely small. Beginning in 1960, however, a series of
amendments to the retirement statute increased both the rate of
contribution for legislators and their maximum annual pension
benefit. See Kass, 567 A.2d at 362-63, 364. In 1987, legislators
granted themselves the last such increase. After voters rejected
a proposed amendment to the Rhode Island Constitution that would
have increased the nominal $300 salary, legislators acted to double
their maximum pension benefit, to $12,000 annually, without
altering the annual premium (by then set at $90, or thirty percent
of the annual $300 salary). See R.I. Gen. Laws 36-10-10.1(a). 
The increase applied both retrospectively (to those already retired
in 1987) and prospectively. See id. 36-10-10.1(c).
 As a result of this increase, the Rhode Island retirement
system no longer qualified as a tax-exempt pension plan under
Internal Revenue Code 401(a) because it was out of compliance
with 415(b), which then limited annual pension benefits to either
$10,000 or the retiree's annual pre-retirement compensation,
whichever was greater. See 26 U.S.C. 401(a), 415(b)
(retroactively amended in 1996). Both the General Assembly and the
Board appear to have been happily unaware of this problem until
1991, when local journalists brought it to their -- and the
Internal Revenue Service's -- attention. 
 The problem was a significant one. If the IRS decided to
strictly enforce the 415(b) limit, then the retirement fund would
need to pay taxes on its investment profits for each year in which
the plan exceeded 415 limits. That, in turn, would put more of
the burden for financing the state's pension obligations on
taxpayers. Individual members of the system could also suffer,
since they would be responsible for annual taxes on the value of
any non-forfeitable accrued benefits. See 6 Mertens, Law of
Federal Income Taxation 25B:01, at 25B-7 (Sept. 1998) (describing 
tax consequences for participants in a non-qualified pension plan).
 After negotiating with the IRS, the state agreed in early
1994 to pass legislation capping past and present legislative
pensions at $10,000. See 1994 R.I. Pub. Laws ch. 87 ("Cap Act")
(codified at R.I. Gen. Laws 36-8-20 and 36-10-10.1). The Cap
Act added a new section to the retirement statute to declare the
state's general intention "that the retirement system satisfy the
requirements of 401(a) of the Internal Revenue Code." R.I. Gen.
Laws 36-8-20(a). Section 36-8-20 also included a number of
specific provisions intended to ensure compliance with Code
requirements, including a section providing that "[b]enefits shall
not be payable to the extent that they exceed the limitations
imposed by 415 of the code." Id. 36-8-20(f). Another section
of the Cap Act explicitly limited legislative pensions to $10,000,
effective July 1995:
 If a [retired legislator] is entitled under subsection
 (a) of this section to an annual retirement allowance
 which is in excess of the amount permitted by 415(b)(4)
 of the Internal Revenue Code, . . . the amount in excess
 of ten thousand dollars ($10,000):
 . . . .
 . . . [s]hall be paid from the retirement system
 after June 30, 1995, only to the extent permitted by the
 limitation on benefits imposed by 36-8-20[(f)] [which
 in turn permits no benefits in excess of Code 415].
Id. 36-10-10.1(e)(1). The Cap Act provided further that "[a]ny
amount not permitted to be paid by the retirement system . . .
shall be paid out of general funds, but only to the extent that
amounts have been appropriated for those payments." Id. 36-10-10.1(e)(2). 
 After the General Assembly chose not to appropriate the
funds required in 1995 to replace the excess benefits, the Board
began reducing monthly payments to each pensioner whose annual
benefits exceeded $10,000. The reductions were quite substantial: 
pensioners who had been receiving the highest pensions (in excess
of $18,000) lost nearly forty-five percent of their benefits, and
collectively the reductions for 1995 totaled nearly $700,000.
 The plaintiffs, a class of 171 retired legislators or
their spouses who had been receiving pensions in excess of $10,000
annually, brought suit against the Board to recover the withheld
amounts, naming as additional defendants Nancy Mayer, in her
official capacities as Chair of the Board and as Treasurer of Rhode
Island, and Joann Flaminio, in her official capacity as Executive
Director of the Board. The pensioners alleged that the Cap Act as
applied violated the Takings Clause, Contract Clause, and Due
Process Clause and that each of the defendants had violated 42
U.S.C. 1983 by implementing an unconstitutional law.
 The pensioners sought a preliminary injunction in July
1995 to prevent the Board from withholding benefits. Their request
was denied because the district court -- discounting Eleventh
Amendment concerns raised by the plaintiffs -- found that
withholding excess benefits would not cause irreparable harm since
the Board could later be ordered to award any wrongly withheld
benefits. Plaintiffs chose not to appeal the denial of the
preliminary injunction.
 A little over a year after the district court's denial of
plaintiffs' motion for a preliminary injunction, Congress amended
 415(b) to eliminate, retroactively, the $10,000 cap for
government pensions. After some prodding from the plaintiffs, the
Board responded by refunding all of the excess benefits that had
been withheld since the Cap Act took effect approximately fifteen
months before (totaling nearly $850,000). It did not refund any
interest earned during the time the money was withheld.
 The plaintiffs proceeded with their suit, seeking to
recover the missing interest as well as attorneys' fees under
 1988. On cross-motions for summary judgment, the district court
(McAuliffe, J.) held that the Cap Act had violated the Takings
Clause and that the Board had violated 1983 by temporarily
withholding benefits pursuant to the Act. It found, furthermore,
that the Board was not entitled to Eleventh Amendment immunity. 
Thus, it denied the defendants' motion for summary judgment,
granted summary judgment to the plaintiffs, and awarded plaintiffs
$31,862.83 in "prejudgment interest" under 1983 and $133,098.50
in costs and attorneys' fees under 1988. The Board and Nancy
Mayer, in her official capacity as Treasurer of Rhode Island,
appeal on numerous grounds. II
 We review the district court's grant of summary judgment
de novo. See Lennon v. Rubin, 166 F.3d 6, 8 (1st Cir. 1999). Out
of the mass of issues presented by this appeal, our first question
is to decide the order in which the issues must be decided. 
 The most obvious of the "order" questions is whether we
must address defendants' Eleventh Amendment arguments before
considering the merits of the plaintiffs' 1983 claims. Under
this circuit's practice, we have considered it permissible to defer
an Eleventh Amendment question until after the merits were
addressed, thus avoiding the Eleventh Amendment question entirely
if plaintiffs lost on the merits. See, e.g., Mercado-Boneta v.
Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9,
11-12 (1st Cir. 1997) (pretermitting "resolution of th[e] [Eleventh
Amendment] jurisdictional issue"); Willhauck v. Halpin, 953 F.2d
689, 713 n.24 (1st Cir. 1991) (noting that jurisdiction may be
assumed in the face of an Eleventh Amendment challenge).
 But the Supreme Court recently declared that courts
should generally determine whether Article III jurisdiction exists
before reaching the merits of a plaintiff's claim. See Steel Co.v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012-16 (1998). 
If Steel Co.'s rejection of "the doctrine of hypothetical
jurisdiction," id. at 1012 (internal quotation marks omitted),
extends to the type of hypothetical jurisdiction approved in
Mercado-Boneta and Willhauck, then we would be obligated to decide
whether the Board can claim Eleventh Amendment immunity before
deciding whether the Board's actions deprived plaintiffs of their
federal constitutional rights.
 Before discussing the boundaries of the Steel Co. rule,
we pause to underline the fact that the rule does not appear to be
an absolute one. While a majority of justices rejected the use of
"hypothetical jurisdiction" under the facts presented, see id. at
1012-16, only three justices (Chief Justice Rehnquist along with
Justices Scalia and Thomas) treated this outcome as inevitable. 
Justice O'Connor, along with Justice Kennedy, joined the Court's
opinion but wrote separately to emphasize that "several of [the
Court's] decisions have diluted the absolute purity of the rule
that Article III jurisdiction is always an antecedent question" and
to explain that "the Court's opinion should not be read as
cataloging an exhaustive list of circumstances under which federal
courts may exercise judgment in reserv[ing] difficult questions of
. . . jurisdiction." Id. at 1020 (O'Connor, J., concurring)
(alterations in original) (internal quotation marks omitted). 
Justice Breyer agreed that, although Article III questions
"typically" should be decided first, "[t]he Constitution does not
impose a rigid judicial 'order of operations.'" Id. at 1020-21
(Breyer, J., concurring in part and concurring in the judgment). 
The remaining three justices found it unnecessary under the facts
of Steel Co. to consider Article III jurisdiction before reaching
other issues. See id. at 1021-32 (Stevens, J., concurring in the
judgment, joined in part by Souter & Ginsburg, JJ.); id. at 1032
(Ginsburg, J., concurring in the judgment). Thus, "[t]he various
opinions in the case, read as a whole, are not entirely clear as to
whether (or to what extent) Steel Co. undermines our earlier
practice [of bypassing jurisdictional issues]." Hardemon v. City
of Boston, 144 F.3d 24, 26 (1st Cir. 1998). 
 It is also important to note the Court's narrow use of
the term "jurisdiction" in Steel Co. The decision in Steel Co.distinguishes between Article III jurisdiction questions and
statutory jurisdiction questions, holding that the former should
ordinarily be decided before the merits, but the latter need not
be. See Steel Co., 118 S. Ct. at 1009-16. Thus, the issue is
whether Eleventh Amendment questions should be treated as Article
III jurisdiction questions for the purposes of Steel Co. This is
a puzzle with a long pedigree. See Wisconsin Dep't of Correctionsv. Schacht, 118 S. Ct. 2047, 2054 (1998) (noting that the Supreme
Court has never resolved whether, or to what extent, "Eleventh
Amendment immunity is a matter of subject matter jurisdiction"). 
See generally Chemerinsky, Federal Jurisdiction 7.3 (2d ed. 1994)
(discussing the history of competing theories of the nature of the
Eleventh Amendment). 
 In some ways the Eleventh Amendment clearly represents a
limitation of Article III judicial power. The Amendment provides
that "[t]he Judicial power of the United States shall not be
construed to extend to [certain suits against states]." U.S.
Const. amend. XI. The Supreme Court has concluded from this
language that "[t]he Eleventh Amendment restricts the judicial
power under Article III." Seminole Tribe v. Florida, 517 U.S. 44,
72-73 (1996); see also Pennhurst State Sch. & Hosp. v. Halderman,
465 U.S. 89, 98 (1984) ("[T]he fundamental principle of sovereign
immunity [under the Eleventh Amendment] limits the grant of
authority in Article III." ). Two further aspects of Eleventh
Amendment doctrine are in harmony with this characterization. 
First, an Eleventh Amendment argument can be raised for the first
time on appeal. See Edelman v. Jordan, 415 U.S. 651, 677-78
(1974). Second, Eleventh Amendment questions can be introduced sua
sponte by the court. See, e.g., Sullivan v. Barnett, 139 F.3d 158,
179 (3d Cir. 1998) (collecting cases), rev'd on other grounds sub
nom. American Mfrs. Mut. Ins. Co. v. Sullivan, 119 S. Ct. 977
(1999); V-1 Oil Co. v. Utah State Dep't of Pub. Safety, 131 F.3d
1415, 1419-20 (10th Cir. 1997); Atlantic Healthcare Benefits Trustv. Googins, 2 F.3d 1, 4 (2d Cir. 1993).
 Because Eleventh Amendment issues are clearly linked to
the question of Article III jurisdiction, some courts have held
that Steel Co. requires them to address Eleventh Amendment
questions before reaching the merits of a plaintiff's claim. See,
e.g., Seaborn v. Florida Dep't of Corrections, 143 F.3d 1405, 1407
(11th Cir. 1998) ("[A]n assertion of Eleventh Amendment immunity
must be resolved before a court may address the merits of the
underlying claim(s).") (citing Steel Co., 118 S. Ct. at 1012-16);
Kilcullen v. New York Dep't of Transp., 33 F. Supp. 2d 133, 136 
(N.D.N.Y. 1999) (same); Johnson v. State Tech. Ctr., 24 F. Supp. 2d
833, 837 (W.D. Tenn. 1998) (same) (citing Steel Co., 118 S. Ct. at
1012-16, and Seaborn, 143 F.3d at 1406).
 But the nature of the Eleventh Amendment is more complex
than these decisions acknowledge. Although Eleventh Amendment
questions are often labeled "jurisdictional," see, e.g., Mercado-
Boneta, 125 F.3d at 12, the Amendment differs in several crucial
ways from ordinary restrictions on subject matter jurisdiction. 
For one, Eleventh Amendment immunity can be waived. See Schacht,
118 S. Ct. at 2052 (citing Atascadero State Hosp. v. Scanlon, 473
U.S. 234, 241 (1985), and Clark v. Barnard, 108 U.S. 436, 447
(1883)); see also Toll v. Moreno, 458 U.S. 1, 17-19 (1982)
(recognizing state's ability to waive Eleventh Amendment immunity
by its actions in a particular case). Furthermore, while courts
have the discretion to raise Eleventh Amendment questions sua
sponte, Article III does not obligate them to do so. See Schacht,
118 S. Ct. at 2052-53 (citing Patsy v. Board of Regents of Fla.,
457 U.S. 496, 515 n.19 (1982)). These two aspects of Eleventh
Amendment doctrine suggest that the Eleventh Amendment is just as
much a grant of immunity (i.e., a type of defense) as it is a
limitation on courts' jurisdiction. See id. at 2055 (Kennedy, J.,
concurring) ("[O]ur precedents have treated the Eleventh Amendment
as 'enact[ing] a sovereign immunity from suit, rather than a
nonwaivable limit on the federal judiciary's subject-matter
jurisdiction.'" (quoting Idaho v. Coeur d'Alene Tribe, 521 U.S.
261, 267 (1997))).
 This suggests, in turn, that Eleventh Amendment issues do
not fall into the category of Article III questions that Steel Co.would define as necessarily antecedent. At least one Supreme Court
decision seems to support this conclusion. In Calderon v. Ashmus,
118 S. Ct. 1694 (1998), the Court considered whether an inmate's
declaratory judgment action presented an Article III "case or
controversy." The Court observed that it needed to address this
question of justiciability before it could reach the parties'
Eleventh Amendment and First Amendment arguments, and then
explained in a footnote that "[w]hile the Eleventh Amendment is
jurisdictional in the sense that it is a limitation on the federal
court's judicial power, . . . it is not co-extensive with the
limitations on judicial power in Article III." Id. at 1697 & n.2. 
Thus, the Court implied that Eleventh Amendment questions are
excluded from the category of Article III issues that must be
addressed before the merits. At least one district court has
explicitly adopted this rule. See Bowers v. National Collegiate
Athletic Ass'n, 9 F. Supp. 2d 460, 498 n.15 (D.N.J. 1998).
 The rule makes sense in light of Steel Co.'s underlying
rationale. Steel Co. rejects the assertion of "hypothetical
jurisdiction" where a court's Article III jurisdiction is in doubt,
because a court without Article III jurisdiction has no power to
declare the law -- it would only be in a position to render an
advisory opinion, see Steel Co., 118 S. Ct. at 1016, which "offends
fundamental principles of separation of powers," id. at 1012. 
Choosing to decide the merits before considering an Eleventh
Amendment argument simply does not present the same risk: because
Eleventh Amendment immunity can be waived, the presence of an
Eleventh Amendment issue does not threaten the court's underlying
power to declare the law. If this were not the case, sua sponte
consideration of a possible Eleventh Amendment bar would have to be
obligatory, not discretionary -- but the Supreme Court has now
clearly stated that courts are free to ignore possible Eleventh
Amendment concerns if a defendant chooses not to press them. SeeSchacht, 118 S. Ct. at 2052-53.
 It seems to us that the relevant maxim in the Eleventh
Amendment context is not that federal courts cannot act without
first establishing their jurisdiction, but rather that courts
should "not reach constitutional questions in advance of the
necessity of deciding them." American Mfrs. Mut. Ins. Co. v.
Sullivan, 119 S. Ct. 977, 991 (1999) (Ginsburg, J., concurring in
part and concurring in the judgment) (quoting Three Affiliated
Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C., 467 U.S.
138, 157 (1984)) (internal quotation marks omitted); see also Maine
Green Party v. Maine, Secretary of State, 1999 WL 115057, at *4
(1st Cir. 1999) (applying "the presumption towards decisional
minimalism").
 Abiding by this "fundamental rule of judicial restraint,"
American Mfrs. Mut. Ins. Co., 119 S. Ct. at 991 (Ginsburg, J.,
concurring) (internal quotation marks omitted), and thus avoiding
Eleventh Amendment questions where there are other dispositive
issues, produces two positive outcomes. First, it permits courts
to avoid squandering judicial resources. Second, and more
important, it avoids forcing defendants to expend their resources
on Eleventh Amendment questions in situations in which they would
rather not do so. The point is made by supposing that a particular
case presents an easy merits issue (favoring the defendant) and a
difficult Eleventh Amendment issue. If the Eleventh Amendment
issue had to be addressed first under Steel Co., then the defendant
would have to focus on that issue in order to avoid setting
unwanted precedent -- even though, in the end, the Eleventh
Amendment issue was not necessary to the court's decision. 
 The application of the Steel Co. rule to Eleventh
Amendment questions would mean that courts were required, under
certain circumstances, to begin their opinions with the equivalent
of "obligatory dicta." We decline to create such a rule.
 III
 Another question in this case, however, does fall more
squarely under the Steel Co. rule. Before we address any other
issue, we address defendants' argument that plaintiffs' claims
became moot when the Board refunded the withheld benefits in 1996. 
If plaintiffs' claims were rendered moot, there would no longer be
any case or controversy, and we would therefore lack Article III
jurisdiction. See SEC v. Medical Comm. for Human Rights, 404 U.S.
403, 407 (1972) (relating the mootness doctrine to the Article III
"case or controversy" requirement).
 After their benefits were refunded, plaintiffs continued
to press two claims: (1) a claim for interest on the benefits (or,
alternatively, damages for the delay in payment), and (2) a claim
for attorneys' fees under 1988. We conclude that plaintiffs
adequately pled and argued (albeit somewhat skeletally) a claim for
interest that was not rendered moot by the Board's refund of the
withheld benefits because it rests on an independent constitutional
basis. They present three possibilities. First, plaintiffs
assert that they have a specific contractual right protected by the
Contract Clause, not only to continue receiving benefits above
$10,000, but also to receive interest on those benefits if payment
of the benefits is delayed. Alternatively, assuming that there was
a Contract Clause right to the withheld benefits, plaintiffs also
assert that this contractual "property" has been "taken" under the
Takings Clause, see Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003
(1984) (noting that valid contracts are property within the meaning
of the Takings Clause), and that the payment of interest would
constitute just compensation for that taking, see Jacobs v. United
States, 290 U.S. 13, 16-17 (1933) (holding that interest is a part
of the "just compensation" that is the constitutionally compelled
remedy for a Takings Clause violation). Finally, plaintiffs assert
that the Board's refusal to pay interest on the withheld benefits
also constitutes a direct Takings Clause violation under First
English Evangelical Lutheran Church v. County of Los Angeles, 482
U.S. 304 (1987). See id. at 321-22 (holding that just compensation
is required for temporary regulatory takings). Since the
possibility of even a partial remedy is sufficient to prevent a
case from being moot, see Calderon v. Moore, 518 U.S. 149, 150
(1996), we proceed to the merits. IV
 Plaintiffs originally alleged violations of the Takings
Clause, the Contract Clause, and the Due Process Clause. The
district court granted summary judgment in favor of the plaintiffs
on the Takings Clause claim and did not reach the other two claims. 
On appeal, plaintiffs have abandoned their Due Process claim but
continue to press the other two. Accordingly, we must decide if
the Takings Clause, the Contract Clause, or both have been
violated.
 Both courts and parties have sometimes treated Takings,
Contract, and Due Process claims as if they were interchangeable. 
This is understandable, given that all three clauses serve to
cabin, on some level, states' ability to act retroactively. But
other recent decisions suggest that when faced with multiple,
potentially relevant constitutional provisions, courts should
invoke the provision that treats most directly the right asserted. 
See, e.g., Graham v. Connor, 490 U.S. 386, 395 (1989) (refusing to
apply "the more generalized notion of 'substantive due process'" on
the ground that "the Fourth Amendment provides an explicit textual
source of constitutional protection against th[e] sort of . . .
conduct [complained of]"); Armendariz v. Penman, 75 F.3d 1311, 1324
(9th Cir. 1996) (en banc) (concluding, based on the reasoning in
Graham, that "private takings" can be addressed only under the
Takings Clause, not the Due Process Clause). 
 Our analysis of the boundaries of the Contract and 
Takings Clauses is guided more specifically by the Supreme Court's
most recent Takings Clause case, which was decided after the
district court granted summary judgment here. See Eastern
Enterprises v. Apfel, 118 S. Ct. 2131 (1998). Read as a whole, the
various opinions in Eastern Enterprises make clear that plaintiffs
must first establish an independent property right before they can
argue that the state has taken that right without just
compensation. Five justices in Eastern Enterprises found that a
federal law requiring coal producers to provide lifelong health
care benefits to ex-employees violated the Constitution because it
imposed "severe retroactive liability" that was "disproportionate to
the parties' experience" on "a limited class of parties that could
not have anticipated th[at] liability." Id. at 2149; see also id.at 2137-60. But only four justices found a Takings Clause
violation. Justice Kennedy wrote separately to explain why he
found takings analysis inapposite, and why the Due Process Clause
provided the proper framework for analysis of the coal producers'
claim. See id. at 2154-60 (Kennedy, J., concurring in the judgment
and dissenting in part) (emphasizing "the importance [to Takings
Clause analysis] of identifying the property allegedly taken, lest
all governmental action be subjected to examination under [the
Takings Clause]"). The four dissenters agreed with Kennedy on this
point (while disagreeing with the content of his due process
analysis). See id. at 2161-63 (Breyer, J., dissenting, joined by
Stevens, Souter, & Ginsburg, JJ.). Thus, a majority of justices
found that the Takings Clause did not apply under the facts of
Eastern Enterprises, because they concluded that a Takings Clause
issue can arise only after a plaintiff's property right has been
independently established. See id. at 2154-58 (Kennedy, J.,
concurring in the judgment and dissenting in part); id. at 2161-63
(Breyer, J., dissenting).
 It is clear that this case does not involve tangible
personal property or real property. It does not involve an effort
to reclaim benefits already paid. The only property interest
alleged is an expectancy interest claimed to derive from a contract
between the state and the plaintiffs to afford a certain level of
pension benefits. The facts here require us to consider whether
plaintiffs had the requisite property right to support a Takings
Clause claim by analyzing their claim under the Contract Clause. 
See NEA, 1999 WL 152589, at *7-8 (denying a Takings Clause claim
because there was no enforceable contract right); Hoffman v. City
of Warwick, 909 F.2d 608, 616 (1st Cir. 1990) (same). Plaintiffs'
claim that the Board's refusal to pay interest on the withheld
benefits constitutes a direct Takings Clause violation must fail
under Eastern Enterprises. Only if we determine that plaintiffs
had a constitutionally protected contract right to the excess
benefits can we consider whether the state took that contract right
without just compensation. 
 V
 The Contract Clause provides that "[n]o State shall . .
. pass any . . . Law impairing the Obligation of Contracts." U.S.
Const. art. I, 10, cl. 1. Although the original intent of this
language was to bar retroactive laws (particularly debtor relief
laws) that would impair private contractual rights, the clause has
long been interpreted to apply to public contracts as well. See,e.g., Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 137-39 (1810). 
 The same two-part test applies in both public and private
contexts. See Parker v. Wakelin, 123 F.3d 1, 4-5 (1st Cir. 1997);
McGrath v. Rhode Island Retirement Bd., 88 F.3d 12, 16 (1st Cir.
1996). A reviewing court must first decide whether a change in
state law has resulted in the "substantial impairment of a
contractual relationship." General Motors Co. v. Romein, 503 U.S.
181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus,
438 U.S. 234, 244 (1978)) (internal quotation marks omitted); see
also Parker, 123 F.3d at 4-5. This question can be broken down
into "three components: whether there is a contractual
relationship, whether a change in law impairs that contractual
relationship, and whether the impairment is substantial." Romein,
503 U.S. at 196; see also Parker, 123 F.3d at 5; McGrath, 88 F.3d
at 16. If each of these three component questions is answered
affirmatively, the court must determine whether the impairment is
nonetheless justified as "reasonable and necessary to serve an
important public purpose." United States Trust Co. v. New Jersey,
431 U.S. 1, 25 (1977); see also Parker, 123 F.3d at 5; McGrath, 88
F.3d at 16. 
 The height of the hurdles plaintiffs must overcome under
each part of this test, however, depends on whether the context is
public or private. Where the state is alleged to have impaired
private contractual rights, the hurdle for plaintiffs under the
second part of the test will ordinarily be higher than in public
contract cases, since states have broad discretion to determine
whether an impairment of a private contract is reasonable or
necessary. See id. at 25-26; Parker, 123 F.3d at 5. But where the
state is alleged to have impaired a public contract, at least where
the impairment operates for the state's benefit, "less deference to
a legislative determination of reasonableness and necessity is
required, because 'the State's self-interest is at stake.'" 
Parker, 123 F.3d at 5 (quoting United States Trust Co., 431 U.S. at
26); see also McGrath, 88 F.3d at 16 ("[W]hen a state is itself a
party to a contract, courts must scrutinize the state's asserted
purpose with an extra measure of vigilance.").
 By contrast, where a public contract allegedly arises out
of statutory language, the hurdle under the first component of the
first part of the test -- proving that a contractual relationship
exists -- is necessarily higher, since "normally state statutory
enactments do not of their own force create a contract with those
whom the statute benefits." Hoffman, 909 F.2d at 614. Indeed,
"absent some clear indication that the legislature intends to bind
itself contractually, the presumption is that 'a law is not
intended to create private contractual or vested rights.'" 
National R.R. Passenger Corp. v. Atchinson, Topeka & Santa Fe Ry.
Co., 470 U.S. 451, 465-66 (1985) (quoting Dodge v. Board of Educ.,
302 U.S. 74, 79 (1937)).
 Finding a public contractual obligation has considerable
effect. It means that a subsequent legislature is not free to
significantly impair that obligation for merely rational reasons. 
Because of this constraint on subsequent legislatures, and thus on
subsequent decisions by those who represent the public, there is,
for the purposes of the Contract Clause, a higher burden to
establish that a contractual obligation has been created. For
similar reasons, this issue is one of federal, not state law. SeeDodge v. Board of Educ., 302 U.S. 74, 79 (1937).
 To overcome this presumption, plaintiffs here must show
that the legislature "clearly and unequivocally" intended to grant
them a contractual right to annual pension benefits in excess of
$10,000. National R.R., 470 U.S. at 466. Statutory language,
standing alone, may evince such an intent if it expressly
authorizes a contract or expressly states that benefits are
contractual. See, e.g., United States Trust Co., 431 U.S. at 18
(deriving clear intent to contract from the use of the phrase
"covenant and agree"); Indiana ex rel. Anderson v. Brand, 303 U.S.
95, 105 (1938) (holding that a statute's repeated use of the label
"contract" demonstrated legislative intent to create a binding and
enforceable obligation). A statutory provision can also evince an
unmistakable intent to contract if it expressly bars future
amendments that would reduce benefits already granted. See, e.g.,
Parker, 123 F.3d at 8-9 (describing anti-retroactivity provision in
Maine pension law); see also id. at 7 (noting that several state
constitutions contain similar provisions barring reductions in
accrued benefits of public employees). 
 In NEA, this court examined the Rhode Island retirement
system and concluded that the language of the state's retirement
statute, standing alone, fails to demonstrate such a "clear and
unequivocal" intent to contract. See NEA, 1999 WL 152589, at *5-6. 
"Nowhere does the statute call the pension plan a 'contract' or
contain an anti-retroactivity clause as to future changes." Id. at
*5. The statute does state that "it is the intention of the state
to make payment of the benefits . . . provided for . . . [and] to
make the appropriations required . . . to meet its obligations to
the extent provided." R.I. Gen. Laws 36-10-7. However, while
this provision "directs state officials to fund the plan as it
exists," it "falls at least a step short of clearly expressing a
contractual commitment not to change benefit levels or other plan
variables by legislation." NEA, 1999 WL 152589, at *5. The
statute's use of the term "vesting" is similarly inconclusive, since
the concepts of a vested right and a contractual right are not
coextensive. See id. at *6. NEA's evaluation of the language of
the statute as a whole encompasses the specific language at issue
here. Nothing in 36-10-10.1(a) -- which provides that retired
legislators "shall be entitled to receive . . . an annual sum of
six hundred dollars ($600) for each year of total service . . . [up
to] twelve thousand dollars ($12,000) annually" -- rises to the
level of an express contractual promise to provide benefits, or to
provide benefits above $10,000. 
 But our analysis cannot end with the bare language of the
statute, since a clear and unequivocal intent to contract can also
be demonstrated by circumstances. See United States Trust Co., 431
U.S. at 18 n.14; NEA, 1999 WL 152589, at *6. Such circumstances,
by their nature, will vary from case to case. Particular
plaintiffs bringing particular Contract Clause claims based upon
the Rhode Island pension statute may find themselves in markedly
different circumstances. In NEA, for example, plaintiffs were
teachers' union officials who were first permitted to "buy in" to
the state employee pension system at attractive rates, then quickly
evicted again after the legislature determined that their inclusion
had no rational relationship to any legitimate government purpose
and would in any case threaten the system's tax-exempt status. SeeR.I. Gen. Laws 36-9.1-1 et seq. ("Eviction Act"); NEA, 1999 WL
152589, at *1-2. This court concluded from these circumstances
that the legislature did not "clearly and unequivocally" intend to
grant union officials a contractual right to future payments by the
state. See NEA, 1999 WL 152589, at *6.
 In NEA, we contrasted the plaintiffs' claim with a
hypothetical claim brought by "quintessential 10 or 28-years-of-
service government employees" whose pension benefits had been
radically reduced. Id. Without deciding the question, we noted
that such circumstances presented a very different Contract Clause
claim. The hypothetical plaintiffs' status as employees of the
state, the general trend toward recognizing retirement benefits as
contractual, see Parker, 123 F.3d at 6-7; McGrath, 88 F.3d at 16-
17, and certain Rhode Island decisions rejecting the notion that
public pensions are gratuities, see, e.g., In re Almeida, 611 A.2d
1375, 1385 (R.I. 1992), could all serve as evidence that the state
intended its pension promises to be binding and enforceable.
 But the circumstances here do not closely resemble these
hypothetical circumstances. On the contrary, they bear a far
greater resemblance to the circumstances at issue in NEA. Several
facts are particularly relevant. First, plaintiffs do not stand in
a classic employer-employee relationship with the state. A
legislator's relationship to the state is different in many
respects from that of a teacher, a tax collector, or other ordinary
public employees. The token salary received by Rhode Island
legislators until 1995 -- a five dollar per diem, up to a maximum
of three hundred dollars per year -- demonstrates that Rhode Island
legislators in particular were not ordinary full-time employees. 
Indeed, they could hardly afford to be. Instead, they served as
part-time, "citizen" legislators. See National Ass'n of Soc.
Workers v. Harwood, 69 F.3d 622, 637 (1st Cir. 1995) (Lynch, J.,
dissenting) (describing Rhode Island's part-time legislature). 
Their initial exclusion from the retirement system, their
subsequent admission as voluntary, not mandatory, members, and
their recent eviction, see R.I. Const. art. VI, 3 (barring
legislators elected after 1994 from participating in the retirement
system), all reflect their special status. 
 Second, the context of the enactment of the legislation
suggests that the state could not have intended to create a binding
contractual obligation to pay benefits at the levels set by the
1987 law. Throughout, the state's intention appears to have been
to maintain a qualified tax-exempt pension. The state's quick
reaction to the excess-benefits problem, once it became aware of
it, demonstrates this intention, which was also stated expressly in
the Cap Act itself. See R.I. Gen. Laws 36-10-10.1(e)(1)
(limiting benefits funded by "the retirement system" to those
"permitted by 415(b)(4) of the Internal Revenue Code"). The
state's intent to have a qualified plan is also demonstrated by the
Eviction Act considered in NEA, since an express ground for
evicting union officials from the retirement system was the fact
that the federal tax code denies qualified status to plans with
non-employee members. See id. 36-9.1-1 (tying eviction to
 401(a) of the Code, which bars qualified plans from admitting
non-employees). 
 Finally, the 1987 law raising the maximum legislative
benefit to $12,000 was passed shortly after, and apparently in
response to, the Rhode Island voters' rejection of a constitutional
amendment that would have increased legislators' annual
compensation. The results had none of the indicia of a true
pension. The increased benefits awarded to legislators who had
already retired did not represent bargained-for consideration for
service, since these legislators' service was already concluded. 
Nor could the increased benefits offered to those who had not yet
retired be considered bargained-for pension benefits, since they
destroyed the qualified status of the retirement system, thus
exposing legislators to possible tax liability for the value of
their accrued benefits.
 We hold that the plaintiffs' claim fails to pass the
first component of the first part of the Contract Clause test --
proving the existence of a contractual relationship. Neither the
language of the retirement statute nor plaintiffs' particular
circumstances evince a clear and unequivocal intent on the part of
the state to grant the plaintiffs a contractual right to benefits
exceeding $10,000. The excess pension benefits eliminated by the
Cap Act were ordinary, "gratuitous" government benefits, which the
legislature was free to eliminate once it became clear that these
benefits threatened the tax-exempt status of the state's retirement
system.
 Furthermore, because the plaintiffs have failed to
establish a contractual right to the withheld benefits, they cannot
show that the Board took their "property" when it withheld the
benefits pursuant to the Cap Act. Under Eastern Enterprises, this
showing is the first part of the Takings Clause test. We hold that
plaintiffs' claim fails to pass it. VI
 Because the Board could withhold the excess benefits
without depriving plaintiffs of their constitutional rights, we
reverse the district court's grant of summary judgment. Our
holding strips plaintiffs of their status as prevailing parties,
see 42 U.S.C. 1988(b); see also Farrar v. Hobby, 506 U.S. 103,
111-12 (1992) (defining "prevailing party"); thus, we also vacate
the district court's award of costs and attorneys' fees under
 1988. 
 The denial of a motion for summary judgment is ordinarily
not a final, appealable order. However, an appellate court has
jurisdiction to review an order denying a motion for summary
judgment where that order is coupled with an order granting an
opponent's motion for summary judgment. See 28 U.S.C. 1291; 10A
Wright, Miller & Kane, Federal Practice and Procedure 2715, at
268 (3d ed. 1998) ("[In this situation,] it has been held that . .
. both decisions are immediately appealable."). Because we
conclude in light of the undisputed facts that the defendants are
entitled to judgment as a matter of law, we remand to the district
court for entry of summary judgment in their favor.
 So ordered. No costs are awarded.